UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY J. STARITA, ) | |
| ) | |
| Plaintiff, ) | Case. No. 06 C 2154 |
| v. ) | |
| ) | Magistrate Judge |
| DONLEN CORPORATION, ) | Arlander Keys |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Beginning in May 2004, Anthony Starita worked as a "truck advisor" for Donlen Corporation, in its Fleet Maintenance Services Department. Donlen is a fleet management company; it provides its customers with ordering, purchasing, management and maintenance services relating to leased trucks and other vehicles. As a truck advisor, Mr. Starita was charged with handling calls from customers and from drivers who may be experiencing problems with a leased vehicle; he was also expected to establish and maintain relationships with service vendors, negotiate prices for services, and secure vendor approval for services and pricing.

The job was not physically demanding; Mr. Starita was expected to work in an office environment, to handle calls and communicate effectively via the telephone, and to possess and use some basic typing skills to write purchase orders. At his deposition, Mr. Starita testified that the bulk of his job involved fielding and making telephone calls; he testified that he spent 85-90% of his time talking on the phone. See Deposition

of Anthony Starita, p. 69-70. He testified that he spent the remainder of his time getting approval from supervisors for repairs or pricing, sending and receiving facsimiles, and talking with supervisors and other workers about repairs and other issues. *Id.*, p. 71.

In mid-October of 2004,[1] Mr. Starita was in a car accident on his way to work; he suffered a cartilage tear in his shoulder, a chest wound and whiplash. Because of the accident and his ensuing injuries, Mr. Starita missed several days of work at Donlen. Although he went to work immediately after the accident, he left work and went to the hospital later that day; he then missed the entire next week of work. After one week off, his physician released him to return to work. It later became apparent, however, that Mr. Starita was going to need surgery on his shoulder. The surgery took place on February 4, 2005, and, in connection with the surgery, Mr. Starita missed another 4 or 5 days of work. After the surgery, Mr. Starita wore a splint on his left arm for about 30 days; despite the splint, Mr. Starita reported to work and was generally able to perform the duties expected of him.

---

[1] The First Amended Complaint alleges that the accident occurred on October 19th; Donlen's Statement of Facts says it happened on October 15th. For present purposes, the exact date really doesn't matter.

2

On March 9, 2005, Donlen fired Mr. Starita. Mr. Starita filed a discrimination charge with the EEOC and, after receiving a right-to-sue letter on January 23, 2006, he filed this lawsuit on April 18, 2006. The parties consented to proceed before a United States Magistrate Judge, and the case was reassigned to this Court on February 8, 2007. The case is presently before the Court on a motion for summary judgment filed by Donlen on January 31, 2008.

## Discussion

Summary judgment is proper when the "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56©; *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). A genuine issue of material fact exists if the "evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). To survive summary judgment, the non-moving party must offer more than "mere conclusory" allegations. *Nowak v. St. Rita High School*, 142 F.3d 999, 1002 (7th Cir. 1998). *See also Matsushita Elec. Indus., Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (the non-moving party must offer more than a "metaphysical doubt as to the material facts"). The non-moving party will lose on

summary judgment if he cannot present sufficient evidence to support each element of his case for which he will bear the burden of proof at trial. *Celotex*, 477 U.S. at 322.

Mr. Starita did not respond to Donlen's motion. The Court originally ordered him to file a response on or before February 29, 2008 – roughly thirty days after Donlen noticed up its motion; the Court then granted Mr. Starita an extension of time to March 28, 2008. Still, a response never came. At one point, Mr. Starita's attorney sent an email to the Court, in response to a second reminder email from the Court (the first went unanswered), suggesting that he intended to seek an extension. By that time, the response was already two weeks late. Yet, the Court is not unmindful of the demands imposed on lawyers, particularly sole practitioners like plaintiff's counsel, and it certainly would have entertained a request for an extension. But counsel never filed the contemplated motion (if, indeed, it was contemplated) and he never formally sought an extension.

Donlen, on the other hand, did file a motion: it filed a motion asking the Court to deem its Rule 56.1 Statement of Material Facts to be admitted, given that Mr. Starita had not responded to it. When plaintiff's counsel failed to show up in court to contest that motion, the Court granted it. Thus, Donlen's motion for summary judgment is before the Court in a posture that leaves Mr. Starita at a disadvantage: the Court has

4

heard nothing from him, other that what he has alleged in his complaint. Having said that, however, the Court must still ask whether the facts, as stated by Donlen, show that there are no material issues of fact to be decided and that Donlen is entitled to judgment as a matter of law.

A plaintiff seeking to avoid summary judgment on an Americans with Disabilities Act claim "must demonstrate that there is at least a genuine issue of material fact as to whether he is disabled, whether he can perform the essential functions of the position, and whether he has suffered an adverse employment action because of his disability." Squibb v. Memorial Medical Center, 497 F.3d 775, 780-81 (7th Cir. 2007)(citing Kupstas v. City of Greenwood, 398 F.3d 609, 611 (7th Cir. 2005)). It's clear that Mr. Starita suffered an adverse employment action - he was fired. It's also clear that he was performing the essential functions of his job. The issues here are whether he was "disabled," as that term is defined in the ADA, and whether he was fired "because of his disability."

The ADA defines "disability" as "(A) a physical or mental impairment that substantially limits one or more of the major life activities of [the] individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment." 42 U.S.C. §12102(2). Mr. Starita's allegations invoke this last definition; he claims that Donlen perceived him as being disabled

5

and fired him based upon that perception. To prevail on his claim - a claim under the "regarded as" prong of the ADA - Mr. Starita must demonstrate that Donlen believed he (1) had an impairment (2) that substantially limited (3) one or more major life activities. *E.g., Squibb*, 429 F.3d at 786 (citing *Kampmier v. Emeritus Corp.*, 472 F.3d 930, 937-38 (7th Cir. 2007)). "Substantially limited" means "[u]nable to perform a major life activity that the average person in the general population can perform"; or "[s]ignificantly restricted as to the condition, manner, or duration under which an individual can perform a particular major life activity as compared to the condition, manner, or duration under which the average person in the general population can perform that same major life activity." 29 C.F.R. §1630.2(j)(1)(i) and (ii). And "major life activities" mean functions such as caring for oneself, performing manual tasks, walking, seeing, hearing, speaking, breathing, learning and working." 29 C.F.R. §1630.2(I).

Quite simply, there is nothing in the record to establish that Mr. Starita was substantially limited in any major life activity, or that Donlen believed him to be so. Mr. Starita sustained three injuries as a result of his accident - a chest wound, whiplash and a shoulder injury involving torn cartilage. At his deposition, he testified that none of these injuries affected his ability to stand, sit or walk. He also testified

6

that neither his neck injury, nor his chest wound, affected his ability to work at Donlen. According to Donlen's Rule 56.1 Statement of Facts, which the Court accepts as true and undisputed, Mr. Starita's doctor released him to return to work one week after the accident; he returned to work with no limitations and no restrictions. Thus, to the extent Mr. Starita's injuries initially caused him to be limited in any way, those limitations would have been resolved by late October.

Of course, Mr. Starita had surgery in February 2005, and he did have some limitations in the wake of that surgery. Mr. Starita was released to return to work a week after the surgery. But, following the surgery, he did have to wear a splint on his arm for about 30 days, which necessarily restricted him in his ability to lift with, and use, his splinted arm. According to his supervisors, he was able to handle all of the responsibilities of his job, despite the splint.

According to Mr. Starita, however, his shoulder injury affected his ability to work. Specifically, he testified at his deposition that, during the thirty day period when he had to wear a splint, he had difficulty typing and answering the phone, and generally just staying awake and sharp, given his level of pain and the effects of his pain medication. Starita Dep., pp. 185-186. He also testified that his shoulder injury affected his ability to sleep and to care for himself – both major life

7

activities; specifically, he testified that, during that 30-day period when he had to wear the splint, he was unable to dress or bathe himself. Starita Dep., p. 188.

But whatever impact Mr. Starita's injuries may have had on his ability to perform major life activities, that impact was short-lived. Mr. Starita testified that his chest wound and whiplash were resolved within a few weeks of the accident, and that even his shoulder was healed within six months of the surgery. In fact, he testified that his ability to use his arm slowly increased from the time of the surgery in February until the time he was released from his doctor's care in the summer of 2005. Starita Dep., p. 189. He testified that, although he considered himself to be disabled for a time, he was no longer disabled by the summer of 2005. See Starita Dep., p. 176. And, for purposes of ADA protection, "disability" does not include temporary injuries or medical conditions. See, e.g., Waggoner v. Olin Corp., 169 F.3d 481, 484 (7th Cir. 1999); Harris v. United Air Lines, Inc., 956 F.Supp. 768, 773 (N.D. Ill. 1996)(knee injury that prevents the plaintiff from working only temporarily does not qualify as a disability under the ADA). See also 29 C.F.R. §1630.2(j)(2)(ii)-(iii)(in determining whether an individual is substantially limited, the Court should consider the duration of the impairment, as well as any permanent or long-term impact of such impairment).

Mr. Starita also testified that his shoulder injury affected his ability to sleep – another major life activity. Specifically, he testified that his sleeping was affected "due to the weird positioning that I had to sleep in, the pain that I was in." Starita Dep., p. 184. He testified that he was "barely" able to sleep, getting only "a few hours a day." *Id.* Again, however, this negative impact on a major life activity was relatively short-lived; he testified that his sleeping was difficult "[t]hroughout almost the whole treatment of the shoulder." Starita Dep., p. 185. This is not enough to establish a disability; nor is it enough to create an issue of fact on the subject. *See, e.g., Squibb*, 497 F.3d at 784 (to justify classification as a disability, the limitations on sleeping claimed by the plaintiff must be "prolonged, severe and long-term")(citing *Burks v. Wisconsin Department of Transportation*, 464 F.3d 744, 757 (7th Cir. 2006)).

In short, Mr. Starita cannot establish that he was substantially limited in any major life activity as a result of the injuries he sustained in the October 2004 car accident. Of the three injuries he sustained, only one – the shoulder injury – affected his ability to perform such activities at all. And even that injury, which limited him for a relatively short period of time, did not restrict his abilities to the extent required under the ADA.

More importantly, even if Mr. Starita could show that he was substantially limited in one or more major life activities, his claim would still fail because he cannot show that Donlen fired him *because of* any disability - perceived or actual. On the contrary, the evidence shows that Donlen fired Mr. Starita because of his poor performance.

Paul Ciccarelli and Ronald Bayer, Mr. Starita's supervisors (Bayer was Starita's direct supervisor; he in turn reported to Ciccarelli), both testified that Donlen fired Mr. Starita because he consistently failed to provide quality customer service to Donlen's customers. And his deficiencies on this score are evidenced in the record. In fact, the record contains numerous documents showing that Mr. Starita's performance - even before the accident - was less than exemplary. Mr. Bayer testified at his deposition that he had to write an incident report on Mr. Starita in August of 2004 for yelling at and berating a fellow employee. *See* Deposition of Ronald Bayer, pp. 58, 61.

And this was not the only time Mr. Bayer had to write up Mr. Starita. The record shows that Mr. Starita was written up four times in the months leading up to his termination. He was written up on January 24, 2005 for failing to provide quality customer service by seemingly deliberately frustrating the caller. *See* Donlen's Appendix, Exhibit 7. And he was written up twice on March 1, 2005 - once for answering a call by giving his

name in three different languages and for failing to help the caller, and once for telling the caller, who was trying to get help for a flat tire, to "put his finger in the hole and blow real hard into the valve stem." See Donlen's Appendix, Exhibits 8 and 9. Finally, Mr. Starita was written up on March 8, 2005 for failing to follow proper procedures for calling in for work. Exhibit 10. Mr. Bayer testified that, with each incident, he discussed the matter with Mr. Starita and reviewed the report with him.

Mr. Starita's first formal review confirms that issues existed early on. In the review, completed in September 2004 – a month before the accident, Mr. Starita's job performance was rated in the middle of the scale across all categories[2] See Appendix Exhibit 6; Bayer Dep., p. 57. But, in the customer service section, the review notes that Mr. Starita "needs to increase the level of courtesy and sensitivity he displays to customers. Exhibit 6, p. 2. Additionally, in a summary section, the review – which is signed by Mr. Starita – notes that he

> needs to show improvements in the area of attendance. He needs to be at work at his proper start time more consistently, and to be ready for work at his proper start time when he arrives. It is important that he show improvements to meet minimum standards for attendance.

---

[2] Donlen's review process called for ratings on a scale of "exceeds expecations" to "meets expectations" to "did not meet expectations" for categories labeled quality, teamwork, job knowledge, cooperation, judgment and customer service; Mr. Starita received "meets expectations" throughout the September 2004 review.

11

*See* Defendant's Appendix, Exhibit 6.

Mr. Ciccarelli, who actually made both the decision to hire Mr. Starita and the decision to fire him, testified at his deposition that he received complaints from customers about Mr. Starita's handling of their calls. He testified that, in response to those complaints, he reviewed the calls handled by Mr. Starita (Donlen records all calls and saves them, archived on DVDs, for one year) and he concluded that the complaints were valid and well-founded. Mr. Ciccarelli testified that he heard the call where Mr. Starita answered the phone by giving his name in three different languages, and he heard the call where Mr. Starita told the customer's driver to stick his finger in the hole and blow into the tire valve, and that he believed both calls demonstrated Mr. Starita's poor customer service skills. Based upon those calls, and based upon Mr. Starita's lack of respect and sensitivity, his overall failure to provide Donlen's customers with the assistance they have come to expect from Donlen, Mr. Ciccarelli testified, Donlen fired him.

On the flip side, there is not a single piece of evidence suggesting that Donlen fired Mr. Starita because it thought him to be disabled or even because he was missing work as a result of the injuries he sustained in the accident. The final write up on March 8, 2005 did deal with Mr. Starita calling in sick. But there is nothing to suggest that the absence itself caused Donlen

to fire him. On the contrary, Mr. Bayer testified – and there is nothing to refute this – that the fact that Mr. Starita was going to be out was not the problem; it was that he failed to alert his supervisors of that fact in accordance with established company policy.

## Conclusion

For the reasons set forth above, the Court finds that Mr. Starita cannot make out a *prima facie* case of discrimination in violation of the Americans with Disabilities Act. He cannot show that he was disabled within the meaning of the ADA because his injuries were temporary and did not substantially limit him in any major life activity. More importantly, he cannot show that Donlen fired him because of his injuries, or because it regarded him as being disabled. Accordingly, the Court finds that judgment in Donlen's favor is appropriate. Donlen Corporation's Motion for Summary Judgment [#40] is granted.

Date: April 30, 2008

ENTER:

*Arlander Keys*
ARLANDER KEYS
United States Magistrate Judge